FILED
12/22/2020
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 1, 2020

## IN RE RYAN J. H.

**Appeal from the Juvenile Court for Marshall County**
**No. 2019-JT-2     Lee Bussart, Judge**

---

### No. M2019-01439-COA-R3-PT

---

This appeal concerns the termination of two parents' parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Marshall County ("the Juvenile Court") seeking to terminate the parental rights of Jared H. ("Father") and Annalisa P. ("Mother") to their minor child, Ryan J. H. ("the Child"). After a hearing, the Juvenile Court entered an order terminating Father and Mother's parental rights on a host of grounds and finding that termination of Father and Mother's parental rights is in the Child's best interest. Father and Mother appeal. We reverse several grounds rightly conceded on appeal by DCS. We affirm the grounds of failure to support as to Father and substantial noncompliance with the permanency plan as to both Father and Mother. In addition, we reverse the Juvenile Court's finding that DCS failed to prove the ground of failure to manifest an ability and willingness to assume custody, and instead find that ground proven as to both Father and Mother by clear and convincing evidence. We find further that termination of Father and Mother's parental rights is in the Child's best interest. Thus, while we reverse the Juvenile Court's judgment in part, we affirm its termination of Father and Mother's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Debbie Zimmerle, Lewisburg, Tennessee, for the appellant, Jared H.

Nicholas W. Utter, Lewisburg, Tennessee, for the appellant, Annalisa P.

Herbert H. Slatery, III, Attorney General and Reporter; and Jordan K. Crews, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

The Child was born out of wedlock to Mother in December 2016. Father executed a Voluntary Acknowledgment of Paternity. In April 2017, the Child entered DCS custody because of concerns about Mother's abuse of prescription medication, Father and Mother's mental health, and Father and Mother's lack of appropriate housing. The Child subsequently entered foster care.

In May 2017, a permanency plan was developed for Father and Mother. Under the permanency plan, Father and Mother were required to maintain regular and positive visitation with the Child; maintain regular contact with DCS and notify DCS of any changes in address, phone number, or employment; maintain suitable housing and pay rent and utility bills on time; comply with homemaking services; create a budget; and have reliable transportation. For his part, Father was required to resolve his "pending legal issues [regarding] insurance" and to "avoid any further legal action." Father and Mother signed the Criteria and Procedures for Termination of Parental Rights acknowledging that they received a copy and an explanation of the TPR Criteria. In January 2018, the permanency plan was revised to contain certain additional responsibilities. Father and Mother were required to participate in anger management classes and follow recommendations. In addition, Father was required to participate in a mental health assessment and follow recommendations, maintain stable employment, and work on getting his driver's license reinstated. Mother was required to continue taking her prescription medications on a regular basis, submit to pill counts, continue to participate in in-home mental health services, and submit to psychological testing in order to assess her parenting abilities. A July 2018 revision of the permanency plan left Father and Mother's responsibilities the same. In December 2018, the permanency plan was revised one last time. Mother was to obtain a legal means of income, and Father and Mother were to participate in medication management.

On March 19, 2019, DCS filed a petition in the Juvenile Court seeking to terminate Father and Mother's parental rights to the Child. DCS alleged the following grounds: (1) abandonment by failure to support, (2) abandonment by failure to provide a suitable home, (3) substantial noncompliance with the permanency plan, (4) persistence of conditions, and (5) failure to manifest an ability and willingness to assume custody. DCS also alleged against Mother the ground of mental incompetence. In June 2019, the petition was tried.

Elena Hawkins ("Hawkins"), an investigator with the Office of Child Safety, testified first. When the Child's case began, Hawkins was working for DCS as a family service worker. Hawkins became involved in the case when the Child entered state custody

in April 2017. Hawkins went to Father and Mother's home. At that time, the parents were living in Shelbyville in a home that Centerstone helped them get. It was a two-bedroom, one-bathroom apartment. The home "needed work." There was limited furniture and issues with bugs. On announced visits, the home would be clean. On unannounced visits, it was not; there were dirty dishes piled up and the floor needed sweeping. By January 2018, concerns arose that Father and Mother would be evicted for failure to pay rent. Father was unemployed, and Mother was trying to get on disability benefits. During this period, Father and Mother were exercising supervised visitation with the Child. The visits could last from thirty minutes to four hours, depending on the circumstances. Father and Mother never progressed to unsupervised or overnight visits.

Father and Mother later moved in with Mother's mother Lori A. ("Grandmother") in Lewisburg, the home the Child had been removed from in the first place. Hawkins testified: "We asked that once [Mother] received disability, that she was to contact us … She was also working with the pregnancy center and was maintaining that she was staying with her shots and medication, along with, you know, keeping Centerstone appointments." Mother, who suffered from seizures, participated in medication management with Centerstone. Hawkins visited Grandmother's home. It was a small, two-bedroom home. Certain other of Grandmother's children lived there, as well. Hawkins testified that the home was clean on announced visits but had a lot of cockroaches.

On cross-examination, Hawkins was asked exactly what was meant by "standard mental health assessment." Hawkins stated: "On a lot of our perm plans we just automatically ask for a mental health assessment and follow-up recommendations, along with an alcohol and drug assessment. And then get stable housing, legal means of income, things like that." Hawkins acknowledged that some of that language was boilerplate included in permanency plans "75 percent of the time." Hawkins stated that the child and family team as a whole, with input from the parties, makes the call on whether to include particular language in a permanency plan. Hawkins testified that Grandmother was not considered as a placement option "[d]ue to the conditions of the child's home and being bench ordered into custody for medical maltreatment and also not being taken to doctor's appointments and the environment that he was in at the time." Asked about the goals of the various permanency plans, Hawkins testified:

> It's pretty much the same goals, because they had not exceeded those expectations at the time, so we just rolled them over pretty much and continued to make sure that they maintained stable housing, legal means of income, transportation, any core issues that they had at the time. A mental health assessment for the mom to maintain compliance with Centerstone and medication management, things like that. So it was an ongoing process.

Hawkins was pressed on whether DCS did anything to accommodate low-functioning parents. Hawkins stated that "we go over it with them several times in the perm plan and ask them if they have any questions or concerns and we address it to where they understand it." Hawkins testified that she felt she had accommodated Father and Mother to the best of her ability. Regarding what she had done to assist Father and Mother besides making sure they understood what they were supposed to do, Hawkins stated:

I transported the child back and forth. Since they did not have transportation, I would take the child to and from the foster parents to the home multiple times. We also, I would -- I took [Mother] to her first -- the pregnancy center and helped her, you know, for doctor's appointments and things like that. So there was stuff that I did just personally that would help them out to try to achieve that goal.

Hawkins stated that she did not know Father and Mother's level of education. Hawkins testified that she could not recall what, if anything, Father was specifically diagnosed with in terms of a mental health condition. Hawkins stated that Father was supposed to complete a mental health assessment but did not do so. Hawkins stated that Father would not follow up on appointments. Asked if she knew why Father missed appointments, Hawkins stated: "I know at least once it was transportation. And the other time I think [Mother] had had a seizure and was in the hospital or something had happened that night [before]." Hawkins stated that Father relied on Grandmother for transportation but that it was difficult for Grandmother to transport him to his appointments. Hawkins stated that the time necessary to complete a mental health evaluation varies, ranging from one to six hours. Hawkins stated that Father relied on Grandmother for transportation because he had unpaid tickets and a suspended license. Hawkins testified that Father could not afford a car of his own. Father eventually paid the tickets and obtained his license. Hawkins testified that Father was "back and forth" on jobs, at one point working for a labor company that assigned him jobs. Father used a bicycle to get around much of the time. Regarding communication, Hawkins stated that Father was sometimes hard to get in touch with. When asked if Father and Mother's biggest single problem was their poverty, Hawkins testified: "I don't know that I can answer that." Hawkins stated that DCS tried to assist Father and Mother in keeping their home clean through the use of a service called Health Connect Homemaker Services, but that success was "50/50."

Continuing her testimony, Hawkins stated that Mother's health issues were a major barrier to her parenting the Child. Hawkins testified:

Q. … When you supervised those visits [during the Child's first eight months in state custody], did you have concerns of the parent/child interactions?

-4-

A. Yes.  At the time it was [Father] that would mainly take care of [the Child].  When we tried to push [Mother] to even fix a bottle, I asked her to help make a bottle and it put her into a seizure.  Of just asking her to read the back of how many scoops to how much water, she got a little bit anxiety and it put her into a seizure.  Throughout the -- when I was doing the visitation, there was a little bit of disassociation, that [Father] would get in the floor more than [Mother] to play with him.  But as the case prolonged [Mother] did start feeling a little bit more comfortable in interacting with [the Child].  I think she changed diapers maybe once or twice.  It was usually [Father] that did all of that and fixed a lot of the bottles, but we tried to ensure [Mother] to, you know, he's not going to break.  That he will -- you know, she can get in the floor and play with him.  And when [Grandmother] would be there, she would mainly play with him and mom and dad would kind of sit back and let [Grandmother] play with him.

With respect to whether Father and Mother showed an interest in visiting the Child, Hawkins stated that one or two times they initiated and asked to visit the Child.  However, Hawkins stated that "a lot of times" she had to tell Father and Mother that they needed to visit the Child.

Next to testify was Courtney Affolter ("Affolter"), a family service worker for DCS who took over the Child's case from Hawkins in October or November of 2018.  In early 2019, Affolter went to Father and Mother's residence.  The home was filled with clutter, and bugs were an issue.  Affolter stated that she went to the residence as recently as the day before the hearing.  Affolter testified:

Q. And what was the condition of the home yesterday?
A. There's still lots of clutter.  There's a path from the living room to the kitchen.  There's lots of clothing in the floors.  There's animal feces from their kittens and their dogs.  They have some roommates that are living with them right now to try to help with financial -- financial barriers, so there's -- their belongings are also in the home.
Q. Where does everybody sleep?
A. Reported by the parents was that she and [Father] share a bed, and the roommate and her girlfriend share the other bed in separate rooms.

Grandmother had moved out of the home.  The home had no electricity or water due to Father and Mother's failure to pay utility bills.  Affolter testified that Father was unemployed.  Affolter stated that Mother was still attempting to get on disability benefits but had not yet had a hearing.

On cross-examination, Affolter acknowledged that disability applications can take a long time to be processed. Affolter also testified that she was unaware of any issues of illegal drug use in the home. Asked if Mother was on the lower end of the functioning spectrum, Affolter stated that Mother "is young and that she has some maturing to do, but I couldn't tell you what her functioning level would be." Asked how DCS modified its approach in dealing with parents who struggle with mental health issues, Affolter testified: "I guess it would just depend. There's a lot of mental health issues. I guess it would just depend on what they were. But as far as specifically things to modify that, no. Just … make sure that the parents understand what their tasks are in a way that they understand." Affolter stated that DCS was unable to help the parents with the utilities problem because the Child was not in the home. Regarding Father's failure to complete a mental health assessment, Affolter stated that it was because of an issue with insurance. Affolter testified that Father had attempted to get insurance through a job, but that he could not hold on to a job long enough to do so successfully. Affolter stated that, although DCS can ask providers to waive fees so parents can obtain a mental health assessment, Father was trying to get insurance through his job when they last discussed the matter. Affolter testified that Father was quiet and preferred to try to solve problems on his own. Regarding other opportunities for the parents, Affolter testified to the "EFC" (Extension of Foster Care) Program, which "is for individuals who have previously been in State custody and is offered to assist with opportunities in employment -- employment and services in their local area, and can help with monetary benefits."

Affolter testified that Father and Mother's residence had animal feces in it, and even had a "cats' room." Affolter stated that there was an odor in the home. Affolter testified: "[I]t's a safety concern as far as sanitation. Like I had mentioned earlier, there's currently still bugs in the home and no utilities and no water." As to who was paying the rent, Affolter stated that a local church or certain local people were helping with that. Affolter testified that Mother's seizure medication cost around $10, but Mother could not afford it.

Father, age 38, testified next. Father testified that as of June 2017, he was ordered to pay $50 per month in child support. Father testified that he was to pay that through a payroll deduction when he was working. Father stated that in June 2017 he was working through Lifestyle Staffing. He worked there for a month and half to two months. After that, Father worked for Walker Dye Casting around the month of September. In October 2017, Father worked at Tyson. After that, Father went back to Lifestyle Staffing. In 2018, Father worked through Randstad, Lifestyle Staffing, and Employee Bridge. Father could not remember where else he worked after the Employee Bridge job because he had so many different jobs. Father was unemployed as of the hearing date. He had not worked for two and a half months. Asked if he paid child support, Father stated: "I believe I've only made a handful of payments. I haven't made that many on the child support order." Father testified:

Q. So if you were ordered to pay in June or July, your first payment would have been due in August of 2017. Did you make any payment in August of 2017?

A. Not that I'm aware of.

Q. If I said that you made two payments, one on 8/7 and one on 8/14 for $11.53 apiece, approximately $22, would that be accurate?

A. Yeah. 'Cause I didn't -- I couldn't remember when the payments were actually started being took out.

Q. Did you make two more payments in September of that year for $11.53?

A. Yes.

Q. One in October for 11.53?

A. Yes.

Q. Two in March of 2018 for 11.53?

A. Yes.

Q. Four payments in April '18?

A. Yeah.

Q. The same amount, $11.53. Did you make any payments in May of 2018?

A. Not that I could remember.

Q. Would it be accurate if I told you you made three payments of $102.46?

A. Yes.

Q. One payment in June?

A. Yes.

Q. One payment in November?

A. Yes.

Q. And then you last made two payments of $11.53 in March of this year; is that correct?

A. Yes.

Q. Is that more or less than what you were ordered to pay in June of 2017?

A. Less.

Father testified that his rent was $350 per month, but he had not paid any rent. Father stated that he and Mother had to leave their previous apartment because they were $4,100 behind in rent. Father stated that he and Mother also lived with another individual on and off, but he did not pay her any rent either. Father testified that he spends around $90 per month on cigarettes, and that Mother has the same habit. Asked to square this expenditure with his failure to pay child support as ordered, Father stated: "I'm usually asking people if they'll help us out." Father stated that he and Mother probably were not going to be able to live rent-free at their current residence much longer. When asked how he intended to get the Child back in the home if that were the case, Father testified simply: "I don't know."

On cross-examination, Father stated that he had earned a high school diploma. Father testified that he was "bullied a lot in school" and "was in special -- special ed classes off and on from kindergarten all the way to 12th grade." Father stated that his own father was never a part of his life, and that it was just him and his mother growing up. Father stated that poverty always had been a part of his life. Father testified that while he had worked regularly in the past, by his early thirties he started having issues with wanting to hold a job. Father stated that his current barrier to getting a job was that he had no Social Security card. He lost his wallet three weeks earlier while swimming. Asked how he got to a place to swim, Father stated that a friend took him. Father testified that he had a driver's license, but that he did not have a vehicle and could not afford one. Father stated that someone was holding a job at a fast food restaurant for him and it was within his walking distance. Regarding Father's level of compliance with his permanency plan responsibilities, Father testified:

> Q. … We've talked about several perm plans in which you've participated and the Department required you to attend a mental health intake, correct?
> A. Yes.
> Q. Okay. You've scheduled at least three of those, correct?
> A. Yes.
> Q. Did you schedule more than three mental health intakes?
> A. I believe I tried to schedule five all together.
> Q. Okay. Did you ever make any of those mental health intakes?
> A. No.
> Q. Okay. Why not?
> A. Usually transportation issue.
> Q. Okay. When you -- the perm plans also indicate that you would obtain -- you would get the mental health intake once you obtained health insurance. Have you been able to obtain health insurance over the last two years?
> A. No.
> Q. Okay. How are you going to be able to afford the mental health intake?
> A. I won't be able to.
> Q. Okay. Has anyone from the Department offered to assist you financially in getting that mental health intake or assessment -- I'm sorry, I keep calling it intake -- getting that mental health assessment funded?
> A. Not that I can remember.
> Q. Has anyone from the Department offered to assist you in -- when you did not have a license, did they ever offer to assist you in getting your driver's license?
> A. No.
> Q. Okay. When you've had transportation issues getting back and forth to child and family-team meetings or to court dates when you were living in

Bedford County, did anybody from the Department ever offer to assist to transport you to those meetings?

A. Not that I can remember.

Q. Now, the Department did offer to transport you and assisted in transporting you to and from visits with [the Child], correct?

A. Yeah.

Q. Okay. And how often did they assist you with those, with that transportation?

A. I really can't remember.

***

Q. … [W]hy didn't you ask Courtney or Elana to assist you financially with the mental health evaluation?

A. Just 'cause I was wanting to try and do it on my own without help.

Q. Okay. It's been two years?

A. Yeah.

Q. You say you wanted help doing it -- you wanted to be able to do it on your own. Is that kind of a point of pride for you?

A. Yeah.

Q. What benefit have you derived from the Department providing services to you over the last couple of years?

A. I've learned a lot about child welfare and everything. There's still a few things that I have trouble understanding, but I've been talking with [Grandmother] and anybody that I can talk to. I've been getting to understand a lot more on how these processes go.

Q. You mean the Court processes or you mean parenting?

A. Court, parenting.

Q. Okay. What services were provided to you from the Department that you felt were helpful?

A. The Homemaker Services were really helpful.

Q. Okay. Were there any other services that they provided?

A. I believe so. I just can't remember what they were.

Continuing his testimony, Father stated that he was capable of getting a job with good pay and benefits. According to Father, the problem was his "maintaining and getting there every day." Father also testified that he was on probation for a domestic incident involving Mother from two months before trial. Father stated that prior to the Child entering DCS custody, Father had been diagnosed by Centerstone with manic depression, bipolar disorder, and multiple personality disorder. Father stated that the last time he consistently received treatment from Centerstone was in 1999, before his mother died.

Crystal F. ("Foster Mother") testified next. Foster Mother and her husband own a daycare. The Child had lived in Foster Mother's home since July 2018. Prior to that, Foster Mother had cared for the Child at her daycare since the Child was four months old. Foster Mother testified that she intends to adopt the Child. Foster Mother stated that her household consists of her husband, her two parents, and her two other foster children. On cross-examination, Foster Mother testified that, to her knowledge, the Child does not speak about Mother. The Juvenile Court asked Foster Mother to describe the Child:

> Q. Okay. Can you just describe [the Child] for me?
> A. Oh, he's perfect. He's a mess. He's a happy-go-lucky two-year old, very, very smart. Loves to play outside; loves to ride his little bike. Loves to play with all of his friends at the daycare, play with our other two children that we have in our home.
> Q. And how old are they?
> A. 22 -- almost 22 months and almost ten months.

Last to testify was Grandmother, the Child's maternal grandmother. Grandmother stated that she had approached DCS about having the Child placed with her, but DCS declined because it was her home the Child had been removed from in the first place. Grandmother stated that the Child calls her "Nan-Nan" and Mother "Mamma." Grandmother stated that the Child acts lovingly toward Mother. Asked if Mother was doing all she was capable of doing, Grandmother testified:

> Kind of, sort of. I mean, I think that there's times when she could have went and, you know, told them that -- 'cause she does have social anxiety. But I think there's times that she could have told them that she needed to be on a different medicine or she may have needed to go to a doctor that maybe she didn't know that she could have gone to or whatever. But I think there was some things that she could have done.

Trial concluded. In July 2019, the Juvenile Court entered an order terminating Father and Mother's parental rights to the Child. In August 2019, Father and Mother timely appealed to this Court. In March 2020, this Court, acting upon a joint motion by the parties, remanded the case to the Juvenile Court "for the limited purpose of resolving any differences between the trial court's oral ruling and its written order and for entry of a new order under Tenn. Code Ann. § 36-1-113(k)." In April 2020, the Juvenile Court entered an amended order terminating Father and Mother's parental rights. The Juvenile Court found, in pertinent part:

[Failure to support]

-10-

Mother never made a payment toward child support, and Father made no payments from November 2018 through March 2019.

The Court concludes that the parents, [Mother] and [Father] have abandoned the child by willfully failing to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the filing of the Petition to Terminate Parental Rights. Pursuant to Department of Children's Services v. Culbertson, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004), every parent has an obligation to support even in the absence of a court order requiring the parent to support the child.

The Court concludes that [Mother] and [Father], are able bodied and capable of working and earning enough to support themselves as well as paying child support.

\*\*\*

[Failure to provide a suitable home]

The Court concludes that [Mother] and [Father], have abandoned this child by failing to provide a suitable home. The Court finds that the child was found to be dependent and neglected by the Juvenile Court of Marshall County, Tennessee and was placed in the custody of the Department of Children's Services. The Court further finds that the Juvenile Court's protective custody order approving the removal found that the Department could not make reasonable efforts to prevent removal due to the children's circumstances. The Court further finds that the Department made reasonable efforts to assist the parents to establish a suitable home by providing services. Despite assistance from the Department and available social services agencies for over 2 and 1/2 years, [Mother] and [Father], have not made suitable progress at improving their home or personal condition so that they can provide a home for the child at an early date.

\*\*\*

[Substantial noncompliance with the permanency plan]

The Court concludes by clear and convincing evidence that [Mother] and [Father] have failed to substantially comply with the responsibilities of the Permanency Plans by not establishing a safe, stable home. [Father] failed to have stable employment and keep a job. [Father] and [Mother] do not have reliable transportation. On March 4, 2019, the Court found substantial noncompliance with the plan, and the Court reiterates that finding.

-11-

***

[Persistence of conditions]

The Court concludes by clear and convincing evidence that the child has been removed from the home by order of the Juvenile Court of Marshall County for a period greater than six (6) months, in fact, almost 2 1/2 years, and that conditions exist in the home which prevent the child's return to either parent. There is little likelihood that these conditions would be remedied at an early date so that the child could be returned to the parents. The Court further concludes that the continuation of the parent child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

***

[Mental incompetence—Mother only]

Mother is diagnosed with bi-polar disorder. She is unable to work, She suffers suicidal ideations. She is persistently noncompliant with her mental health treatment. The Court finds that the condition, in and of itself, does not preclude [Mother] from parenting; however, her inability to effectively medicate and control her disability supports termination. By clear and convincing evidence, the Court hereby finds Mother's mental incompetence is grounds for termination.

***

[Failure to manifest an ability and willingness to assume custody—not found against either parent]

The Court hereby finds the child has been in State custody since February 2017, when he was approximately 2 months old. Mother and Father do not have a parental bond with the child. In the two years of this pending dependency and neglect action, Mother and Father have been unable to stabilize their mental health, housing, or finances. The Court finds the parents have demonstrated a willingness, but not an ability to provide for the child's financial needs. Therefore, the Court does not find grounds for termination due to both parents' inability to assume legal and physical custody.

-12-

***

[Best interest as both Father and Mother]

The Court concludes that termination of [Mother] and [Father's] parental rights to [the Child] is in the child's best interests. The Court concludes that Tenn. Code Ann. § 36-1-113(i)(2) is present in that [Mother] and [Father] have not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in their home despite reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonable appear possible; that Tenn. Code Ann. §36-1-113(i)(3) is present in that [Mother] and [Father] have not maintained regular visitation or other contact with the child; that Tenn. Code Ann. § 36-1-113(i)(5) is present in that a change of caregivers at this stage of the child's lives will have a detrimental effect on the child; and that Tenn. Code Ann. §36-1-113(i)(9) is present in that [Mother] and [Father] have not paid child support consistently with the child support guidelines promulgated by the Department of Human Services pursuant to Tenn. Code Ann. § 36-5-101 when financially able to do so.

The Court concludes that termination of [Mother] and [Father's] parental rights to [the Child] is in the child's best interest. The Court concludes that Tenn. Code Ann. §36-1-113(i)(1) is present in that [Mother] and [Father] have not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in their home; that Tenn. Code Ann. §36-1-113(i)(3) is present in that [Mother] and [Father] have not maintained regular visitation or other contact with the child; that Tenn. Code Ann. §36-1-113(i)(4) is present in that there is no meaningful relationship between [Mother] and [Father] and the child; that Tenn. Code Ann. §36-1-113(i)(5) is present in that a change of caregivers at this stage of the child's lives will have a detrimental effect on the child; and that Tenn. Code Ann. §36-1-113(i)(9) is present in that [Mother] and [Father] have not paid child support consistently with the child support guidelines promulgated by the Department of Human Services pursuant to Tenn. Code Ann. §36-5-101 when financially able to do so. Further, the Court concludes that termination of [Mother] and [Father's] parental rights is in the best interest of the child because they have shown little or no interest in the welfare of the child.

Finally, the Court concludes that termination of [Mother] and [Father's] parental rights to the children [sic], [the Child], is in the child's best interest because the child has established a strong bond with his foster parents who wish to adopt them.

Thus, the Court concludes that several factors under §36-1-113(i) are present. Accordingly, termination is clearly in the child's best interest.

Father and Mother appeal.

## **Discussion**

Although not stated exactly as such, Mother raises the following issues on appeal: 1) whether the Juvenile Court erred in finding grounds for termination of her parental rights on the basis of abandonment, noncompliance with the permanency plan, mental incompetence, and persistent conditions; 2) whether the Juvenile Court erred in finding that termination of her parental rights is in the Child's best interest; and 3) whether DCS made reasonable efforts to assist her in light of her mental health issues. While not stated exactly as such, Father raises the single issue of whether the Juvenile Court erred in finding that termination of his parental rights is in the Child's best interest given DCS's failure to make reasonable efforts to assist him. DCS raises a separate issue of whether the Juvenile Court erred in declining to find against both Father and Mother the ground of failure to manifest an ability and willingness to assume custody.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747,

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

-14-

102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination for both parents, even though Father does not appeal any of the grounds found against him. Throughout their briefs, both parents take issue with the reasonableness of DCS's efforts to assist them. Our Supreme Court has held that "in a termination proceeding, the extent

of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015).

The Juvenile Court found the following grounds against both Father and Mother: (1) abandonment by failure to support; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plan; and (4) persistence of conditions. The Juvenile Court also found against Mother the ground of mental incompetence. In its petition, DCS alleged the additional ground against both Father and Mother of failure to manifest an ability and willingness to assume custody, but the Juvenile Court declined to find this ground against either parent. These grounds are set forth in statute as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;
> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

***

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated;

***

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; …

Tenn. Code Ann. § 36-1-113(g) (Supp. 2018).[4]

The relevant definitions of abandonment are set forth by statute as follows:

---

[4] We apply the parental rights termination statutes as they were in effect on March 19, 2019, the date the petition seeking termination was filed.

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

\*\*\*

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

*** 

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

*** 

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children; and

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

Tenn. Code Ann. § 36-1-102(1) (Supp. 2018).

As an initial matter, DCS concedes on appeal the grounds of abandonment by failure to support against Mother, abandonment by failure to provide a suitable home against both Father and Mother, persistence of conditions against both Father and Mother, and mental incompetence against Mother. Upon our review of the record and the applicable law, we find DCS's concessions appropriate. These grounds were not proven by the necessary clear and convincing evidence. We, therefore, reverse the Juvenile Court's judgment finding the grounds of abandonment by failure to support against Mother, abandonment by failure to provide a suitable home against both Father and Mother, persistence of conditions against both Father and Mother, and mental incompetence against Mother.[5]

---

[5] Mother also argues that the Juvenile Court erred in finding against her the ground of abandonment by

We next address the remaining issues concerning Father, beginning with whether the Juvenile Court erred in finding that Father abandoned the Child by failure to support. As the petition to terminate was filed on March 19, 2019, the relevant four-month window of time for examination is November 19, 2018 through March 18, 2019. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed*. The Juvenile Court found that Father made no child support payments from November 2018 through March 2019. The evidence reflects that Father made two child support payments of $11.53 in March 2019 and one payment in November 2018. It, however, is unclear whether these payments were made in the relevant four-month window. Nevertheless, even assuming that Father made those child support payments in the relevant timeframe, Father himself acknowledged at trial that he paid less than his court-ordered child support payments of $50 per month. In view of Father's $90 per month cigarette budget, his failure to pay $50 per month in child support is particularly baffling. Father presents no explanation for the discrepancy that could be construed, or sustained, as a defense of lack of willfulness. Further, Father himself testified that he is able to work and earn a living. Under these circumstances, Father's deficient support payments constitute token support for the Child. We find that the ground of abandonment by failure to support was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding against Father the ground of substantial noncompliance with the permanency plan. With respect to what constitutes substantial noncompliance with a permanency plan, our Supreme Court has stated:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d at 548-49. The Juvenile Court found that Father was in substantial noncompliance with the permanency plans in that he failed to have stable employment and keep a job; failed to have a safe, stable home; and failed to obtain reliable

---

failure to visit. However, the Juvenile Court did not find that ground against her in its amended order, nor was it even alleged.

-22-

transportation. The evidence does not preponderate against these findings. Given the reasons the Child entered DCS custody in the first place, these responsibilities were reasonable and related. However, Father failed to act on them in any sort of serious way. The grossly unsanitary state of Father's residence, despite DCS efforts to assist him in that regard, attests to his lack of effort under the permanency plan. We find that the ground of substantial noncompliance was proven against Father by clear and convincing evidence.

We next address DCS's issue of whether the Juvenile Court erred in declining to find against Father the ground of failure to manifest an ability and willingness to assume custody. The Juvenile Court found that Father demonstrated a willingness but not an ability to assume custody of the Child. DCS argues that the Juvenile Court erred in finding that Father demonstrated a willingness to assume custody of the Child, pointing to the continual state of squalor in which Father lived over the course of the two-year custodial episode, his prioritizing cigarettes over child support, a domestic incident involving Mother from two months before trial, and a failure to maintain a steady source of legal income. As this Court stated in *In re Amynn K.* with regard to what constitutes "willingness" for this ground, "Father's *actions*, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child." *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018) (emphasis added), *no appl. perm. appeal filed*. Likewise, Father's actions in the present case raise doubts as to his actual willingness to assume custody of the Child. The Juvenile Court did not elaborate on what actions Father undertook that serve to show his willingness to assume custody of the Child.

Our thorough review of the record reveals no actions by Father showing any such willingness on Father's part, and we find that the evidence preponderates against the Juvenile Court's finding that Father demonstrated a willingness to assume custody of the Child. Rather, Father took virtually no concrete steps to assume custody of or financial responsibility for the Child. With respect to ability, the record is clear as to Father's inability to parent the Child. The evidence does not preponderate against that particular finding made by the Juvenile Court.

The second prong of this ground requires us to determine whether "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14) (Supp. 2018). Given, among other things, the wretched conditions of Father's home, and the prospect he may no longer even have a home given his chronic failure to pay rent, we have no serious doubt that placing the Child in his custody would pose a risk of substantial harm to the Child's physical and/or psychological welfare. We reverse the Juvenile Court in its declining to find this ground, and find instead that the ground of failure to manifest an

-23-

ability and willingness to assume custody was proven against Father by clear and convincing evidence.

In the final issue concerning Father, we address whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest. The factors to be considered by courts in determining whether termination of parental rights is in a child's best interest are set forth in statute as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2018).

The Juvenile Court made its findings concerning the Child's best interest, quoted above, and the evidence does not preponderate against these findings. Father argues at length, however, that DCS's efforts were inadequate, and that this is decisive to the question of best interest in his case. In his brief, Father argues:

> [Father's] circumstances are circular and tragic. He is unable to maintain employment because of transportation issues and is unable to remedy his transportation issues because he cannot maintain employment. He is unable to qualify for the "Safety Net" because he obtained employment (a requirement of the family permanency plan) but cannot maintain employment long enough (see transportation issues above) to 1) qualify for insurance or 2) to obtain enough funds to cover the out-of-pocket expense of a mental health evaluation. … And without the assistance of the Department, [Father] was unable to complete this most basic of tasks. Had the Department assisted in funding the assessment, assisted in finding funding for the assessment, and/or assisted with transportation issues, this case could have potentially had a drastically different outcome.

Father is correct that the circumstances presented here are very unfortunate. However, we disagree with Father that DCS somehow was primarily to blame for Father's failure to progress. Father's own testimony shows otherwise. When asked at trial why he did not seek help from DCS in getting a mental health assessment, Father testified "[j]ust 'cause I was wanting to try and do it on my own without help." When asked if this had to do with a "point of pride," Father answered in the affirmative. Acknowledging that DCS helped in at least some regard, Father testified that "[t]he Homemaker Services were really helpful." Father testified that DCS provided other services which he could not remember. Father stated that he was capable of getting a good job with benefits, but the problem was "maintaining and getting there every day." Against all of this self-inflicted damage, just saying "transportation issue" is not a sufficient excuse. We note that Father managed to get a ride to go swimming with a friend a few weeks before trial where he lost his wallet and Social Security card, thus preventing him from quickly getting hired anywhere. In

contrast to this instability, the evidence is uncontroverted that the Child is thriving in Foster Mother's care. The Child deserves permanency and stability, which regrettably Father has shown he cannot provide. We find, by clear and convincing evidence, that termination of Father's parental rights is in the Child's best interest.

We next address those issues concerning Mother, beginning with whether the Juvenile Court erred in finding against Mother the ground of substantial noncompliance with the permanency plan. The Juvenile Court found Mother was in substantial noncompliance with the permanency plan by not establishing a safe, stable home and lacking reliable transportation. In her brief, Mother asserts:

> The testimony might reflect that the Mother could have done better, but the record is silent as to what were Mother's specific failures. With respect to other areas of specific testimony, the provision of stable and suitable housing appears to be the most prominent. However, for the duration of most of the case, the parents were living at the former home of the maternal grandmother, so ultimately the issue is more to do with suitability. The most egregious factor relating to suitability was the lack of utilities, which ultimately comes down to money. What Mother needed most in that areas, was help with the disability process, which does not appear to be stressed in the permanency plan, and the reasonable efforts of the Department. In most other areas, Mother submits she was in substantial compliance with the plan.

We are cognizant, as was the Juvenile Court, of Mother's health problems, and acknowledge it is likely that these problems contributed to her failure to comply with the permanency plan in certain respects, particularly as it related to getting a job and insurance coverage. It is also quite plausible, as Affolter testified to at trial, that the disability benefits application process takes an inordinate amount of time. Poverty and health problems are not, in themselves, grounds for termination of parental rights. Our focus on this ground is on a parent's effort to comply with the permanency plan rather than total achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009), *Rule 11 perm. app. denied May 18, 2009*. However, that does not excuse Mother—or Father, as we have discussed—from doing what they are able to do notwithstanding their other barriers. The continually deplorable state of the home is a chief example. Mother's residence contains animal feces, roaches and clutter. Mother does not state why she is unable to do anything to improve these conditions. These conditions go to basic sanitation, not keeping a spotless or immaculate house. Even affording full deference to Mother's poverty and health challenges, there is nothing in the record to indicate that she could not do anything to improve the condition of the home. That Mother is waiting for an answer on disability benefits does not mean she is unable to do anything else of substance under the permanency plan in the meantime. We decline to

hold that a parent's failure to act on her permanency plan responsibilities can be excused by the fact that she is waiting on a seemingly interminable disability benefits application process to resolve. We find the ground of substantial noncompliance with the permanency plan was proven against Mother by clear and convincing evidence.

We next address DCS's issue of whether the Juvenile Court erred in declining to find against Mother the ground of failure to manifest an ability and willingness to assume custody of the Child. The Juvenile Court found that Mother demonstrated a willingness but not an ability to assume custody of the Child. The Juvenile Court did not elaborate on what demonstrated willingness on Mother's part. From our own careful review of the record, we find no evidentiary support for the Juvenile Court's finding as to Mother's willingness. While words are not necessarily meaningless, actions are more consequential than words in assessing a parent's willingness to assume custody of or financial responsibility for a child under this ground. If this were not so, then merely saying "I want to assume custody of my child" could suffice to fulfill the willingness part of this prong of the ground. We are confident our General Assembly did not intend such a result as it would emasculate the statute. Even giving full measure to Mother's health and financial problems, Mother has undertaken little significant action of substance toward assuming custody of the Child. Mother has, at least, attempted to get on disability benefits. Were she to succeed, that would be a positive thing, certainly. However, applying for disability is not, by itself, a manifestation of a willingness to assume custody of the Child, nor is it a cure-all for doing mostly nothing in the case otherwise.

With respect to ability, it is abundantly clear from the record that Mother is unable to care for the Child. Mother does not work and maintains a squalid residence, which includes a "cats' room," and there are animal feces, roaches and clutter in the home. There is no indication that Mother has addressed her mental health issues or medication management issues that formed part of the basis for the Child's removal in the first place. The trial testimony reflects that Mother's interactions with the Child were difficult, at best, although they did improve slightly over time. Based on this record, Mother has manifested neither an ability nor willingness to parent the Child.

The second prong of this ground requires us to determine whether "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14) (Supp. 2018). Given the conditions of Mother's home as well as Mother's unresolved mental health issues, we have no serious doubt that placing the Child in her custody would pose a risk of substantial harm to the Child's physical and/or psychological welfare. We reverse the Juvenile Court in its declining to find this ground, and find instead that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest. Relatedly, Mother raises a separate issue of whether DCS made reasonable efforts to assist her in light of her mental health issues, which we subsume in our best interest analysis as to Mother. Mother argues in effect that she did as much as she could in this case given her poverty and mental health issues. The Juvenile Court made its findings relative to the Child's best interest, quoted above, and upon our review of the record, the evidence does not preponderate against its principal findings. Mother argues nevertheless that DCS's efforts were inadequate. In her brief, Mother states:

> From the testimony, the Department provided a list of things for Mother to do, via the Permanency Plan, some of which were boiler plate items. The issues most pressing for the Mother are largely rooted in mental/physical health issues and income. The income portion is related to the mental and physical health issues in so far as it impacts access to care and medicine. In spite of these issues, the only modification the Department made to its protocol of reasonable efforts, was to basically read the requirements to them more slowly. The Department did recommend the Extended Foster Program for employment help, but no witness actually testified regarding Mother's participation in that, or lack thereof. The court did note in the oral ruling that the parties had made significant efforts, it was just not enough. While there is a certain measure of conjecture in saying what exactly would have helped these parents more, it is clear that the efforts were not specifically tailored to address all of the unique problems inherent in persons suffering from profound physical and mental health disabilities.

Mother is correct in that DCS's reasonable efforts are one relevant consideration in a best interest analysis. However, there are (9) non-exclusive best interest factors for courts to consider. Even if DCS's efforts were woeful, which they were not in this case, that would not necessarily be dispositive if, under the circumstances, other factors held greater weight. The Juvenile Court found, among other things, that Mother has no meaningful relationship with the Child, that Mother has shown little or no interest in the welfare of the Child, and that Mother has failed to effect a change in conditions as to make it safe and in the Child's best interest to be in her home.[6] In none of these respects can the primary blame in this case be attached to DCS. While we are cognizant of and sensitive to Mother's mental health issues, the record reflects that Mother simply has not progressed to a point where she could realistically parent the Child, nor is that point even in prospect. As Mother rightly acknowledges, it is conjecture as to what more DCS could have done to alter this basic fact. Meanwhile, the evidence is uncontroverted that the Child enjoys a close bond

---

[6] We note the Juvenile Court made these same findings with respect to Father, as well.

with Foster Mother, and is thriving in her care. We find, by clear and convincing evidence, that termination of Mother's parental rights is in the Child's best interest.

In summary, applying the standard of clear and convincing evidence, we reverse the grounds of abandonment by failure to support against Mother, abandonment by failure to provide a suitable home against both Father and Mother, persistence of conditions against both Father and Mother, and mental incompetence against Mother. We affirm the grounds of abandonment by failure to support against Father and substantial noncompliance with the permanency plan against both Father and Mother. In addition, we reverse the Juvenile Court's determination that the ground of failure to manifest an ability and willingness to assume custody was not proven, and instead find that ground proven as to both Father and Mother. Finally, we affirm that termination of Father and Mother's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed, in part, and reversed, in part, resulting in our affirming the termination of Jared H. and Annalisa P.'s parental rights to Ryan J. H. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Jared H. and Annalisa P., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE